Good morning, may it please the court. Let's wait to get everybody seated, Ms. Shapiro. Please. May it please the court, my name is Alexandra Shapiro and I represent Dean Skellis on this appeal. I'm going to focus on the McDonald issue. In its closings, the government repeatedly and emphatically told the jury not to bother giving much thought to official action. In lengthy passages spanning seven transcript pages. I read the summations last night, I don't recall them telling the jury that. I understand that they referenced official acts that would not satisfy McDonald in certain meetings and all. But I'm not sure they told the jury not to give official acts much thought. Well, your honor. It's just helpful if we stay focused on what they did and didn't say. Their words effectively wrote the element out. The government. That's just not so. I mean, your brief also is a little selective in the facts. So I'm going to ask you to stay focused on what the government did say, what the court did charge, and of course, what McDonald now requires. Yes, your honor, and I'm happy to do that. The government talked over and over about multiple witnesses who testified about lobbyist meetings, the Department of Health meeting, and the fact that just about anything senators do is in their official capacity. The government said- To the ABTAC scheme, correct? That's correct, your honor. So I think it would also be helpful if we treated the three schemes uniquely. Excuse me, I cannot hear you, Judge Ratchey. I'm sorry, Judge. I speak into the microphone. I was asking Ms. Shapiro to distinguish the three schemes because, as she referenced the Department of Health meeting, that pertained to the ABTAC scheme. The other two schemes, if I'm correct, involve meetings with Mr. Skelos himself, correct? Not setting up meetings with third parties. That's correct, your honor. Okay, so let's hear you. If I may, your honor, I would like to first go back because the government made a number of remarks that applied across the board. The government said that everything counted, no matter how big and how small, that the case was over because Senator Skelos had set up a meeting. That making a public statement, meeting with a lobbyist, calling another official, are all official actions because senators do them all the time. The government referenced defense arguments, urging the jury to focus on yes or no votes on legislation, and specifically told the jury to reject those arguments because they, quote, wrong, flat wrong, because official action runs the whole gamut. At the end of the day, there was a legislative action in respect of each of those three cases, the ABTAC, the PRI, and the Glenwood. That's not correct, your honor, and I think we've argued, and I'm not going to belabor this point here, but we've argued in our briefs that the evidence of quid pro quo was insufficient. But indeed, the judge would- The question was whether there was a legislative act in relation to each of these three schemes. Well, we don't conceive that there was any legislative act in which Senator Skelos voted any particular way in exchange for favors to his son. We do not conceive- You argued he would have voted that way anyhow, but there was a legislative act in each respect, was there not? Your honor, not with respect to ABTAC, and if I could, I really would like the court- What about the design build with ABTAC? Your honor, there was not sufficient evidence of that. The government focused- We're not asking you about the sufficiency of the evidence now, because that's a separate argument that you're making. We're just asking whether the government's contention that each of these schemes pertained to legislation. In this case, we have the legislative act on which they were relying, or am I missing something? Your honor, I don't agree with that, because the point, the government repeatedly said in its summation to the jury that the Department of Health meeting was what Senator Skelos supposedly sold in exchange for these favors.  I think that's a re-characterization of the summation. I mean, I know that they did argue that the meeting was an act, but you're suggesting as if they told them to ignore everything else, and I don't think you're going to be able to cite us to where in the summation they said that. Your honor, this is just one example. The government said, and I also want to make an important, this is at page 581 of the appendix starting at pages 2549, and this is just one example, the government said, now let's go to the DOH meeting because this is just devastating, devastating evidence. We'll go through the emails. This is Beth Garvey, and they go on and on for numerous paragraphs talking about evidence of this meeting. And then they say, this is the meeting, they get the meeting, official action, official action from Senator Skelos in exchange for the payments to Adam. There's another part of the summation where the government says that the ABTEC case is over with the meeting. And I want to also really highlight something that is not in the briefs, but it's a comment that Judge Wood, who presided over the trial, heard all the evidence, heard the summations, said. And this was at the sentencing proceeding on May 12th of 2016 on page 66 in connection with our oral argument for bail pending appeal. And the government made just the types of arguments that your questions are implying. And in response, and they pointed to her Rule 29 ruling regarding the legislation. And this is what the district court said. As Ms. Shapiro, and this was, by the way, before the McDonald decision had issued and based solely on the oral argument before the Supreme Court. Judge Wood said, as Ms. Shapiro pointed out, that's all true. This case is factually different from McDonald. And in the Rule 29 decision, I referenced specific legislation. But I think she's right, that in the instructions I gave the jury, and in arguments made by counsel to the jury, there is a danger that the jury decided the case based on a rationale that, at the time, she said, may be rejected by the Supreme Court. And I respectfully submit that under the Yates rule, which requires the court to reverse a conviction where a jury is presented with an invalid legal theory and a legally valid theory. And it's impossible to tell which one they rested their decision on. A new trial is required, and that principle of law has been upheld numerous times. And most recently, in the McDonald case, the Supreme Court reversed the conviction and insisted that there had to be at least a new trial, even though there was evidence that the court mentioned from which a jury could have inferred that Governor McDonald pressured other officials to either grant the research studies or add the drug to the state health plan, but repeatedly said that- Your time is up, so I have some questions for you, and I want you to focus on these to help us out. In the ABTEC scheme, apart from the statements you've cited, the government also talks about this being a bribe to get legislation, and he was paid to have the senator push through legislation, the quid pro quo was the legislation. This is all at page 584. But even if we assume that on the ABTEC scheme, there is this concern because of the Department of Health meeting, what would be the parallel concern with respect to the Glenwood and the PRI transactions? There, the government's summation does seem to focus all on the recurring legislation, what they call the extenders. Well, Your Honor, I respectfully disagree. We could start with page 556 of the appendix, where the government speaks about essentially all three schemes and starts talking about the jury instructions and the fact that the defendants are going to argue that things like setting up meetings with lobbyists, making public statements are not in their official capacity, that all of these things are official because senators like Dean Skelos do them all the time. And it's no defense at all, then, on appendix page 573- There is no doubt, Ms. Shapiro, I need you to focus on what we're asking you. There is no doubt that the government argued that the meetings were official action. But the question in terms of deciding whether we can say, beyond a reasonable doubt, that the defendants were convicted based on what McDonnell says is official action, is my concern is that their argument on these two schemes is all about getting the legislation. And I know you can cite isolated passages, but reading the summation as a whole, I'm suggesting to you that it doesn't leave one with a reasonable doubt. And you need to tell us why that's wrong. Your Honor, that's wrong because the government expressly argued, and here's another example. At page A573, extensively they referenced testimony by Glenwood's lobbyists and said every time the senator met with one of them on a lobbying, that's official action. Yes, I know they argued that, but before and after that, it's all about the extender legislation. It's inconceivable that the jury would have said, well, we have reasonable doubts about that, particularly when, as Judge Hosting pointed out, the legislation was enacted. But instead have convicted based on the meetings. So what would give us reason to think that that was even plausible? The reason it's even plausible is that the government had no evidence linking Mr. Skelos' vote to any favors for the sun. Indeed, they strained to try to make a connection. The jury inferred that. Well, we don't know what the jury inferred about legislation, because the jury wasn't asked to answer the right question. And the- Was asked to answer, in effect, was there a quid pro quo? But the qu- The jury could infer from the benefits to Adam, in exchange for legislation and lobbying leading to legislation, that there was an official action. No, Your Honor, they couldn't because they were never asked to think about whether the quo was legislation. The instructions and the government's arguments made it easy for them to just ignore that element in effect. And indeed, I'll just give one example because my time is out. I'd like to give- It was vital for each of these schemes that there be a specific piece of legislation. Your Honor- Without that, there was no benefit to the taxpayer. Let me just give one example. In the PRI case, Mr. Bonomo hired Adam Skelas at a point in 2012, significantly after the extenders had been passed, and they weren't due up for a re-vote for several years. And by the time they came up for a re-vote, Adam Skelas no longer had any association with PRI. And Mr. Skelas voted for the legislation. The whole reason the government introduced so many witnesses who testified about how everything that the Senator does is in his official capacity, the reason they devoted so much trial time to the Department of Health meeting, the reason they took full advantage of this instruction in their closings and in their rebuttal closing was precisely because they were concerned that they couldn't necessarily make their case based on the legislative action. And with regard to ABTEC, the legislation at issue is primarily the county, and all the evidence shows that this RFP was granted to ABTEC based on a full and fair competition versus two other companies, and that they won fair and square. And there's no evidence in the record of Mr. Skelas pressuring anybody. May I ask you one other question about McDonald? And this focuses only on the Glenwood and PRI schemes where you've acknowledged that the meetings were all with Mr. Skelos. Is that a difference from McDonald? In McDonald, the governor was alleged to have used his offices to set up meetings with He facilitated the meeting. Here, if I understand the government's theory, Mr. Skelos took these meetings as part of the larger scheme of payments to his son so that he would facilitate legislation. So he gave lobbyists the opportunity to discuss with him what they wanted in the legislation. Why is that not different from McDonald? Well, I think it's different because, for two reasons. One, in McDonald, the government alleged, and apparently there was some evidence at the trial, that the governor, that these meetings were not so innocent, in effect, and that the governor was trying to pressure other officials on those two points I mentioned earlier. In addition, the Supreme Court made crystal clear, and I would particularly urge the court to focus its attention on the passages in the section of the opinion, discussing the constitutional concerns, that essentially simply selling access, if you will, or granting meetings is not sufficient to satisfy either the statute or the constitutional concern. Doesn't it depend on the meetings? I'm sorry? Doesn't it depend on the meetings? No, your honor, it doesn't. The government has to prove a quid pro quo, an intent to accept a benefit in exchange for official action within the meaning of McDonald. Quo is to meet, to frame a legislation, followed by legislation. Doesn't that distinguish itself from McDonald? Well, we don't concede that that was the quo, and that's not what the, I really urge the government to read the six pages, seven pages in the transcript where the government goes on and on about the fact that it's no defense at all that these are just meetings. And that the case is over, that official action runs the whole gamut, that they should just ignore the defense arguments that the jury should focus on legislative votes. That's what the government told the jury to do. And there's no reason for the court to assume that it's not possible that the jury did exactly as the government told them. Particularly when the instruction was, as the government said it would be, that the jury could consider anything an official did in his official capacity as official action under McDonald. I ask my question with respect to the meetings with Mr. Skelos, the government's theory is that he took the meetings and that they were in order to discuss the legislation that was then enacted. And so for the jury to have found him guilty even on the meetings, there would have had to have been an understanding that this was the quid pro quo. I mean, the meeting was for the purpose of him making a decision on the legislation. What am I missing here as to why that's not distinguishable from McDonald? Because, Your Honor- It wasn't just a meet and greet. Well, but the meetings that Governor McDonald set up weren't just meet and greets either. He was- They were, the decision maker there was not corrupted. Here, the decision maker is Mr. Skelos. And so his decision making as he takes the meeting is already corrupted on the government's theory. By the payment to his son. Well, Your Honor, I respectfully submit that that is not consistent with the way the government argued this to the jury. And the jury was repeatedly told not to find what Your Honor suggested, but rather to simply find that they didn't need to think about the official action because anything counted. They talked about even making public statements, for example. And Judge Wood herself was extremely concerned about this. Yes, they did. You want to tell me where they identified the public meeting as the quid pro quo? I understand they identified it as official action. But they discussed with this jury what Adam Skelos was being paid for. And they repeatedly said that it was for the legislation that was needed. Your Honor, they- They said there was other official action. I agree with this because they viewed the whole thing as part of a scheme. But we're here on whether or not we can say that we have no reasonable doubt that the conviction was based on Mr. Skelos agreeing to certain decisions. Your Honor, first of all, with respect to the abtect- You're saying he agreed to make the decision at the meeting. And then he did indeed make that decision. That is not what they're saying. And with respect to the abtect, there's nothing like that, Your Honor. The only thing with- I'm not asking you about abtect. But I want to also just focus the court on the law in this area of harmless error. Because I think the court is misstating the law with all due respect. And that the question for the court is whether it's impossible that the jury convicted on the valid theory. And I will say, both in preparation for this argument and otherwise, I've read many, many cases that involve situations like this, where there's a valid and an invalid theory presented to the jury. And in a couple of cases, you see reversals where there's one or two comments in a summation. I have never seen a case with this many statements by the government, much less one in which a court has concluded the error was harmless. Thank you. We'll hear from the government. I'm sorry. I'm very sorry, Counselor. Mr. Culp. May it please the court. Robert Culp, assigned counsel for Adam Skelos. We, of course, join in the arguments you just heard and the additional arguments in the Dean Skelos brief. I'm here to focus on point one of my two briefs, which is sufficiency of the evidence as to Adam Skelos. And specifically, I'm here in support of the proposition that to join a quid pro quo or bribery type conspiracy or to aid and abet a quid pro quo or bribery type scheme. You need, at a bare minimum, to be aware and knowledgeful of the quid, the pro, and the quo. And what I'm focused on here is the quo, the legislation, and the government's theory that Dean Skelos engaged in a quid pro quo. And particularly as to Glenwood and PRI in exchange, votes on legislation in exchange for Adam Skelos getting jobs and business opportunities. Now, I just want to make clear, I strongly agree with the arguments in Dean Skelos' brief that there was no quid pro quo, but I'm here to focus on Adam. And I'm assuming arguendo, I suppose, that there is a quid pro quo. I don't think you can uphold an aiding and abetting or joining of the conspiracy type conviction, where the government has failed, as it did here, to introduce evidence that Adam knew about this legislative agenda. Whether it's PRI and the insurance extenders, or whether it's Glenwood and the legislation supported by the realty industry. To me, it's almost self-evident that you must show knowledge of both the quid and the quo. And the government argues, in its brief, in essence, that the quo is a detail- What do you think Adam had in mind when he asked his dad to get him a job? I don't know that, there's no evidence in the record of it being put that way, but- Dad, get me a job. Dad, get me a job. This is- He's going to, his dad happens to be, coincidentally, the majority leader of the Senate. Yes. And responsible for legislation that's very important to the three businesses that we hit upon. Yes, yes. And, your honor, I- I don't think it's in his mind, in Adam's mind, that his father having the power to control, or at least to influence legislation needed by each of these three employers would be using that. And that he wanted his dad to use that because he wanted the job and he didn't care about the consequences. I think it's up to the government to prove that beyond a reasonable doubt. One could speculate what is- How do you prove intent? You prove it by acts from which a jury can make a reasonable inference. And the acts were clear. Dad, get me a job. Dad, use your influence to get me a job. Meaning, dad, shape the legislation. It doesn't come into the record that way, with all due respect, your honor. And in terms of the job, I'd like- That's in a conspiracy case. I'd like to make two points, if I might. One is that this is commonplace, and therefore, going back to McDonald, is something we ought to be concerned about. But I think it's commonplace that public officials are probably asked to help friends or relatives or whatever get jobs. The question is, are we going to include in the net- The public official is asking someone else to get jobs. It's not someone asking the public official for help. Fair point, your honor. And I, if I misspoke- Let's say what happened here. Okay, but even if you assume, I am assuming arguendo that that happened. You have to show that Adam Scalise knew about the quo, or how is he in on a bribery scheme? If the net is so wide that simply getting the job from a political supporter of the public official- Let's start with the PRI, for instance, where he was not coming to work. And indeed, when he was called on it, he basically engaged in insubordinate conduct that would get anybody fired. He did not get fired, and indeed said to his superior that his father and the CEO of the company had an agreement. Now, I'm not suggesting to you that that spelled it out in black and white. But the inference from the totality of the circumstances is that he was given a no-show job because his father and the head of the company had an agreement about the extender legislation that was vital to this company's survival. Why could the jury not have reasonably inferred that? First of all, the testimony, your honor, as to the arrangement had to do with working part time. It didn't say anything about an arrangement to enact certain legislation. He was trying to show up two days a week. He wasn't doing even that. So it's a no-show job. The jury could certainly have concluded that. And as I said, there's conduct that vis-a-vis a supervisor that would have gotten any person fired. It didn't get him fired. Respectfully, we can't be putting people into the bribery net based on judgments that they're bad employees, and I'm not disputing anything you said. You're asking what would have alerted Adam Skelos to the fact that his position was the product of a corrupt deal. And I'm asking you to tell us why the nature of his employment would not, and his knowledge of the relationship or the fact that this company depended on extender legislation, coupled with his father's position, would have told him that. Being a bad employee, being an overpaid employee, being an overcompensated- Being a no-show employee. Being a no-show employee doesn't mean you're in on a bribe. It means you're a no-show employee. I really would urge- And why would he think he was given the no-show job? Maybe because he's the son of a senator. Right. And for nothing. I'm not blind to that, but that doesn't make the son of a senator in on a bribe scheme. All right, now we'll put it together with the son's own conduct on, for instance, the I'm sorry, I'm drawing a blank momentarily on the name of the company, the one I was telling Ms. Shapiro. Glenwood, maybe? No, the other one. PRI. Yes. Now, his conduct there was more indicative of knowing that his father had to take action. Because the phone call exchanges there, particularly with Mr. Mangano, showed that he knew that his father took action in connection with his employment. Whether or not the ABTEC scheme survives McDonald, it shows his knowledge in connection with his employment and his father's taking of action. So why wouldn't he think the same was going on in a job where he was doing even less? Your Honor, those elements do not survive McDonald. And I don't know how they bear on. The fact that his father impacted, it doesn't matter whether the ABTEC scheme can survive. It would be proof of his knowledge in connection with the other scheme, that he knew his father had to act on behalf of his employment. My recollection of the evidence you're referring to has to do with an inquiry into the timing of a payment that had already been promised to ABTEC. It had nothing to do with state legislation. The ABTEC is actually devoid- It's a sufficiency question, unlike Ms. Shapiro's question about alternative theories. We do look at the evidence in the light most favorable to the government or to the jury verdict. And you did in the Biagi case. And I, in the strongest possible terms, urge you to read that decision and consider it carefully as binding precedent. And Biagi, the son of Congressman Biagi, received an enormous amount of stock through himself and his law firm. And it was, by any measure, way too much for any kind of compensation for legal work done. So we have a similar sort of no-show kind of concept here. And this court stipulated that there was a bribe or a quid pro quo between former Congressman Biagi and the defense contractor that paid him that amount but gave it to the son instead. And this court said, at some length, that we're indulging jury speculation here if we uphold this conviction. We just don't have evidence that the son was in on it. Now, the court said, this is not to say that the son was completely free of innocent intent here. because the court said maybe the son should have realized that this was a possible violation of a conflict of interest provision or something like that. In other words, his father was earning money outside of his proper position as a federal congressman. But the court said very strongly that this is not sufficient evidence that the son was in on the bribery scheme. What was missing there was an admission made by Adam Skelos here, that his father and the CEO of this company had an agreement. And that's why he didn't have to show up from work. Now, you're saying- There's no such admission, Your Honor, in all fairness. That testimony is about a part-time arrangement. There's no admission that, thanks for the job, my father's going to, Pat, there's nothing like that in the record. The jury was not obliged to draw that inference. I think they were, Your Honor, and I think- Thank you. We'll hear from the government. May it please the court. My name is Thomas McKay, I'm the Assistant United States Attorney in the Southern District of New York. I represent the United States in this appeal, as I did at the trial. For years, Adam and Dean Skelos carried out three brazen schemes, where they extorted payments and no-show jobs for Adam Skelos from companies with critical legislation pending before Dean Skelos. Judge Wood described the evidence as overwhelming, copious, and enormous. And she found the defendants, quote, intended to link payments by Glenwood and PRI to Adam Skelos to specific legislation favorable to those companies. All right, but the problem for you is that the charge given appears to have problems in light of the McDonald decision. And so, Ms. Shapiro has said that in light of certain arguments that you did make in summation, you've conceded that in your brief about meetings and public statements and all that, that we would have to, at a minimum, order a new trial. Tell us why you don't think so. I'd like to address each of those remarks that Ms. Shapiro described in our closing statement. And I can go one by one through each of them and why we don't think they carry quite the weight that Ms. Shapiro would assign to them. But a few overarching remarks at the outset about the summations. And the first is that the charges and the evidence and the argument in this trial were carefully divided into three separate schemes. So as the court's questions have indicated, it is important that analyzing this, the court look separately at all the schemes and not smush them together as Ms. Shapiro's argument would have had. So at times, as Ms. Shapiro says, you talked about the evidence collectively. I mean, I read the summations, I understand that in the main you treated each scheme separately, but her concern is that you also sometimes referred to the official acts generally. And let me be very clear about what we did and didn't argue with respect to each scheme. Because on both the Glenwood and the PRI schemes, yes, we did say that meetings, the lobbyist meetings were official actions. But we did not argue that these were the quid pro quo, these were the basis of conviction. What we argued- You argued they were the official action. That's correct, Your Honor. But saying that this is an official action- Excuse me, this is Judge Winder. You're saying you did not tell them they could convict based on setting up lobbyist meetings? On the Glenwood and PRI accounts, yes, that is what I'm saying. Saying that this is an official action is not stating a crime, it's not stating a basis to convict. The crime is the quid pro quo. And what we described- There is a long passage in the summations where you ask the jury to pay close attention to what you're going to say. You then divide actions into big actions and small actions. The big actions are the votes, the small actions are setting up the meetings. And you conclude by saying if your official actions are bought and paid for, that is the crime. No matter how big, how small those actions are. That's not telling them they couldn't convict? No, Your Honor. And if I may- They convict based on lobbyist meetings? I think the quote that you're referring to is one of two quotes that we say statements like that in specific response to arguments about the DOH meeting and the Ed Mangano call. And let me be clear, because as we acknowledged in our brief, as to the DOH meeting, when we argued that setting up that meeting was an official action, was a basis for conviction, we went too far. We have conceded that in our brief. But the point is that in the context in which the- With the benefit of McDonald, you went too far. But the point is, at the time, were you suggesting to the jury that if they found that Dean Skelos set up that meeting, that was an official action and that would be enough to support conviction? With respect to the DOH meeting and the DOH meeting alone, yes. But let me talk about- Yes is yes what? Yes, we did argue that they could convict based on the DOH meeting. But I'm trying to just draw a clear distinction between the DOH meeting and the rest of the ABTEC scheme on one hand, and also the Glenwood and the PRI schemes on the other hand. Because as- Let's say just with ABTEC. In light of your acknowledging that you did argue to the jury that setting up the DOH meeting would be enough to convict. Why do we not have to order retrial at least on that scheme? Three reasons, Your Honor. First, the strength of the evidence. Second, the section 666 count. And third, the focus and the context of the argument. But this is not a strength of the evidence review. My understanding is we have to be able to say that we're convinced beyond a reasonable doubt. That the jury convicted, would have convicted even without that argument. Well, Your Honor, in conducting that analysis, this court has said that the most important factor in conducting a harmlessness review is in fact the strength of the evidence. And the focus and the context of that argument is important. Because the ABTEC scheme was not presented as a series of different agreements. This payment for this action, this payment for this action. It was an as opportunities arise scheme. Where Adam Skelos would get a stream of payments, and in return, Dean Skelos would do various actions that ABTEC needed as the opportunities arose. Now, the other actions were things like not blocking Nassau County legislation as they had explicitly threatened to do in the hostage email. Pressuring Nassau County officials to expedite payments under the county contract. Agreeing to insert in the state budget legislation funding for storm water. All of those things are undisputedly still official action after McDonald. And all of them were supported by overwhelming evidence at the trial. What about the pressuring of the county? That's not official action, is it? Pressuring county officials absolutely isn't official action after McDonald. In fact, McDonald specifically said that among the things that are official action is exerting influence over another public official so that he takes an official action. Now, I don't think there can be any dispute that allocating money under a county contract is an official action. So when Dean Skelos- Paying money that's already due and owing. Well- Official action is expediting the payment of money that they were already owed. Correct, expediting the payment. And that's what happened in and around the phone calls at the time of the New York City police officers. So his influence is that of a Senate majority leader who could influence the budget of Nassau County. Exactly right, your honor. And there's abundant testimony in the record that Nassau County was utterly- There's at least two aspects of the legislation. One is the design build legislation, which allowed Nassau County to give a contract both to the designer and the builder, making the contract much more lucrative. That's essentially correct. And the second is the influence on the budget. Well, two things that were going to be in New York State legislation- Those were both basic to ABTEX business. Yes. Do you argue that Quid Pro Quo was giving Adam Skelos the favorable jobs? Yes, because ABTEX's $12 million Nassau County contract was not fully funded, it was important to them that the Senator put stormwater funding in the budget legislation. The question I want to put to you is this. If the jury could decide that there was Quid Pro Quo, based in part on the argument of meetings, and based in part on the instruction that meetings could be official action, can the jury verdict be upheld on the strength of the other evidence of the Quid Pro Quo being legislation? Yes, Your Honor, because as I was saying, the argument was an as opportunities arise scheme with a series of actions that Dean Skelos took and agreed to take. And so just because after McDonald, one of those things, the Department of Health meeting, is no longer an official action, that doesn't vitiate the jury's finding that Dean Skelos did do all these other things. In a conspiracy of a number of overt acts, if some of the overt acts are not proved and others are proved, and the jury is unanimous as to what is proved, that's sufficient to uphold the conspiracy. Well, this isn't, here I'm talking about the substantive counts as well, because it's the objects of the agreement, the various quotes. Yeah, and the substantive act as well. That's correct, Your Honor. And let me add two more. Here that if they convicted based on official action that does not survive McDonald, that even though they could have convicted on other theories, if we don't know, that's not going to be good enough, right? Well, first of all, let me make two points in response to that. The first of that is, right, under a harmless error of use standard, if you can't tell, that is not good enough. But we think that because of the overwhelming evidence and the section 666 count as to the undisputedly official acts, I'd like to get to that in a moment, you can find beyond a reasonable doubt that the jury convicted based on the abtex counts, on the undisputedly official actions, and not just on the Department of Health meeting. Because to think otherwise, you'd have to find that the jury divided up the abtex scheme into various different mini agreements. This payment for this act, this payment for this act, as opposed to one agreement to do a series of acts, the vast majority of which are undoubtedly official and only the Department of Health meeting is not. But let me go quickly to the 666 point. Because the 666 count, which was not charged in McDonald, contains an element that provides an additional assurance that the jury convicted based on legislation and not on meetings. And that is that the jury was specifically instructed that the value of the business or transaction that the corrupt payment was intended to influence had to be more than $5,000. Now, there was no evidence and no argument about the value of any of these meetings. To the contrary, specific evidence- It's not the meetings that has to have the value, it's what the meetings are about. Which was about, what was this, the fracking and meetings. That would have been of, have a value of at least $5,000 or more to abtex. Well, I think the instruction was that it was that the value of business or transaction that the corrupt payment was intended to influence. And so, just because the fracking legislation- To influence the fracking decision. It was the meeting, it wasn't supposed to influence that in the abstract. Right, but then that's the fracking legislation is the business or transaction. But here, if the argument is that the meeting was the business or transaction, that was not worth $5,000. And we specifically highlighted this in our jury instructions. But let me go back to the- We're not persuaded by that. Let me ask you this. If the DOH meeting might be viewed as problematic under McDonald. And if there's a question as to whether or not the making a phone call to advance the payment of monies that are already due and ongoing does not involve a new decision, a new official action by the county officials. Then there is the possibility that the jury might not have been persuaded that the water issues and all that were the official act because that legislation, for various reasons, was never enacted, right? So we don't know what happened with ABTEC, which particular transaction or act the jury focused on. Your Honor, the defense counsel and the government at the trial made the centerpiece of the ABTEC case the hostage email. This is a quote from the defense closing argument. This is the quid pro quo that they're talking about in reference to hostage email. That's at 2681. And the hostage email was undoubtedly about legislation. It said so in the text of the email. It was an explicit threat to do or not do legislation. That's Charlie Durego's quote from 620 of the transcript. And so throughout this trial, the focus of the ABTEC count, by defense's own admission, although not in their appellate briefs for obvious reasons, was this hostage email, which was supported by overwhelming evidence. And so you can conclude, even if you have questions about the Department of Health meeting or even the Mangano call, although we think that speeding up a payment is certainly an official action, that even just looking at the hostage email alone, that's a sufficient basis to convict. And I'd like to quickly go back to the PRI and the Glenwood counts and try to draw the distinction between that and the argument about the Department of Health meeting, if I may, because the arguments were very different there. On both the PRI and the Glenwood, these were meetings that Senator Skelos personally attended with Glenwood's lobbyists, with PRI's lobbyists, with their CEO. And what we argued to the jury was, yes, these are official actions, we said that. But we didn't argue them as the quid pro quo. Here's what we said was the quid pro quo on the Glenwood count. That- Pages when you're quoting. It's 2503 of the transcript running on to 2504, and we said that is the quid- Appendix page. I don't have the appendix page, Your Honor. I'm sorry, I'm just using the transcript sites here. But what we said was, that is the quid pro quo, ladies and gentlemen. Adam Skelos would get money- 8570. Thank you, Your Honor. This is at the bottom of that page running on to the next. Adam Skelos would get money, and in exchange, the Senator would help with legislation. We made similar arguments in the PRI context at 2587 of the transcript and other places. And on both of those counts, the argument was this, that what was important about those meetings was not the fact that the meetings existed or were set up, but rather what happened at the meetings. The way in which the PRI and the Glenwood employees and lobbyists would tell Dean Skelos, here's what we need in the upcoming legislative negotiations. And Dean Skelos would say, great, now I need you to pay my son. It was the corrupt bargain that was struck at those meetings. There was no testimony from Anthony Bonomo or Charlie Durego that what they were paying for were meetings. They said what they were paying for was legislation. So this is entirely different from McDonald, where the whole nub of the government's argument was this access theory that Williams paid to get meetings from the governor. These meetings were instant in tune. That's correct, Your Honor. They were part and parcel of these legislative negotiations. That's how legislation is shaped. Correct. And in fact, one of these meetings even happens up in Albany in the heat of the negotiations over the Rent Control Act of 2011. And to respond briefly to the point that you can't infer corrupt intent because these were Dean Skelos' core legislative positions. That Rent Control Act is incredibly illustrative in that fact. There were two different real estate groups which were lobbying for different aspects of that legislation. And I can break down the details for you, Your Honor. But the key point is that REBNY, the group affiliated with Glenwood, got their priority, the reauthorization of 421A. But the RSA did not get their priority, the keeping down of the rent deregulation threshold. And so on the Glenwood and the PRI counts, even if you were to find that there was error in the instructions, there's no reasonable possibility that the jury ignored what happened at these meetings and rested their conviction based on the meetings alone. I see that my time is up. If the court has no further questions, we'll rest on our brief. Thank you. I would like to ask you whether your argument, I have it at page 2700, where you refute the defendant's argument that you describe as seeking to cabin. You are the jury's consideration over whether Senator Skelos would vote yes or no on particular legislation. You then go on to say that this is a case, you then go on essentially to say they can convict on any one of Senator Avella's broad description of official actions. Your Honor, I'm not sure I would characterize it exactly that way. First, what I would say is if you look at what we're responding to in that argument, we're responding to specific defense arguments about the Mangano call and about the Department of Health meeting. But the statement that this is about each and every one of those pieces of official action, that is fully consistent with our theory and what I'm arguing to you now, which is that these were as opportunities arise schemes. It wasn't a one-off agreement, this payment for this vote, this payment for this action. As to each scheme, the defense agreed to do, or Dean Skelos agreed to do, a series of things on behalf of the person paying his son as the opportunities arose. And so you can't divide up these into a bunch of sub-agreements. That wasn't the evidence, that wasn't the argument to the jury. And that's why we think that even as to the abtec counts where we have this argument about the Department of Health meeting, you can find beyond a reasonable doubt that the jury convicted based on quid pro quo for legislative actions. Thank you. Thank you, Your Honor. Mr. Shapiro, you reserved some time for rebuttal. Yes. I'd just like to make a couple of points. First, with regard to the government's argument about abtec, I would just refer the court to page A575, in which the government argued the following. Dean Skelos also asked his staff to set up a meeting with abtec and another New York State government agency, the Department of Health, about abtec's involvement in fracking. You saw the emails in black and white, and the senator's own staff testified about this. So the abtec case is pretty much right there, over. And here, before this court, the court is saying that the case wasn't really over with the abtec. Also on page A581, the court again turned to the meeting and went on for over a page, but I'll just quote one sentence. Now let's go to the DOH meeting because it's just devastating, devastating evidence. And yet, now that McDonald has been decided, the court would suddenly have this court believe that Mr. McDonald, in the DOH meeting, was the centerpiece of the case. More broadly- I ask you for the site again on the first part that you raised, 575, I just want to be- Yes, it's appendix 575, starting on transcript page 2523. I just wanted to make sure I had the page correctly, thank you. And with respect to the broader argument and the other two schemes, the government argues that these many passages in the summation are just about official action. They're not about the quid pro quo. And with respect, I think that makes no sense because the whole concept of a quid pro quo means there has to be a quid in exchange for a quo, and the whole issue here is what type of quo counts. And so when the government gets up, and whether it's referring to one scheme or as in the pages that Judge Winter questioned the government about on appendix page 556, near the beginning of the first closing, where the government went on and on about how the defense wants you to think that things like setting up a meeting or making calls about a few thousand dollars don't count, it's wrong, and so on, and that it's no defense at all. They're going to what is a quo, and there can't be a quid pro quo without a quo. So this is at the heart of whether the jury was given the proper tools to determine whether the evidence showed that Mr. Skelos committed a crime. And the jury was- I'm asking for help on the pages because- I'm sorry, Your Honor. 556 is trial transcript. Yes, so 556 of the appendix starting at 2487, line 12, and going to 2488, line 20. But this is all at 556 of the appendix. I think so. 2487 is page 566, that's why I was- I'm sorry, it must be a typo. I apologize, Your Honor, it must be a typo. Thank you, thank you. But the point is, in any event, and this was the passage Judge Winter was focusing on early in the government's argument, is that the government said this is no defense at all. It was focused on the quo, and the jury was never asked the question, because of the instructions and because of the way the closings were argued, the jury was never asked to answer the question, did the government prove that Mr. Skelos traded his vote for favors to his son? And that's the central question in this case. And I respectfully submit that the court may well find the conduct here distasteful or as Chief Justice Roberts put it in the McDonald case, that that case involved what he called a tawdry tale of Ferraris, Rolexes, and so forth. But he said that's not the issue, and that's not the issue here. The question is, should a man be deprived of his liberty by a jury that was given an erroneous instruction and didn't have to find that he committed a crime after it was told over and over by the government, after having heard extensive testimony that anything a senator does is official action. May I ask you to keep looking at page 8566 for a moment with me. The language about the meetings and the statement by the government that it's flat wrong to think that these meetings are not about official actions. I see that at transcript pages 2488 and 89. But it follows immediately after that, I'm at lines 11 and 13 of page 2489. These companies were not paying Adam Skelos to punch a clock for them at the office. They were paying for Dean Skelos to cast his votes for them in Albany. And then at 2490 at lines 18 through 20, this is Glenwood, asking Skelos to take specific official actions on tax breaks and other legislation. Those kind of quotes that I just gave you are throughout the government's summation. And the question is, what do we make of those kind of statements in light of the ones you highlighted for us? I mean, it suggests that at least with respect to Glenwood and PRI, the government did characterize the meetings as official acts, but put them in the context of Dean Skelos agreeing to cast votes. Not just, as I said, to give people an hour of his time. Why shouldn't that be enough to establish the harmlessness the government urges? Because the issue here is whether the government has proved beyond a reasonable doubt and whether this court can be virtually certain that this jury convicted on that basis. When we have an invalid theory that was presented to them, we have Supreme Court case law that holds that where there's a valid theory and an invalid theory. And the court can't be certain that the jury rested on the correct ground, that Mr. Skelos is entitled to a new trial, maybe they can prove their case at a new trial. And maybe they should have considered this when they fought for the overbroad instruction, knowing that McDonald was out there. But they didn't, and they played this to the hilt, and they said other things too. But the question is, should the man be deprived of his liberty without a fair assurance that the jury considered the proper question? You heard me ask the government with respect to ABTEC that there were so many different events and But with respect to the Glenwood and the PRI, given the kind of interlinking of the meetings and then the votes, can you tell me how a rational jury could have thought that the meetings were quid pro quo, but not the legislation? Well, let me say two things in that regard. One is, I think, when you look at the overall context here, the effect, the combined effect of the instruction, the evidence that was given about how everything a senator does is in his official capacity by multiple witnesses, and these summation arguments that I've been focused on. And you look at, that I think what the jury was essentially told and what a rational jury clearly could have taken away easily from the instructions and the combined effect of the evidence in the government's arguments was that they really didn't have to worry about official action, because it was so easy to prove, it was like a peppercorn, and that's really the big problem here. And I will say again, and I understand that the court may not accept the sufficiency argument, but I think if you read our brief carefully, you'll see that the government didn't have a silver bullet. There was no real evidence that Mr. Skelos was making clear or asking anyone to do anything in exchange for his vote. And the fact that he had these longstanding positions is just very persuasive evidence that his vote wasn't up for sale because everybody knew he was going to vote this way anyway. But I think really the big issue is that this jury was effectively told not to even bother to think about this official act because it was so easy to prove, and that's the problem, Your Honor. Thank you. Thank you. Thank you very much. Mr. Culp, you also reserved a little time. So, I got ignored. That's okay, because that's my point that I got ignored. The government had the jury listening to this case for a month. They had the key people, Derego, Bonomo on the stand. Did they ever ask them a question, hey, did you ever talk to Adam Skelos about the quo part of this? Did you ever talk to him about the legislative part of this? Adam Skelos wasn't in those meetings. So, they're asking you to assume that something happened, that they declined to prove. They also kind of ignored me in my brief, and again, that's okay. That they had three months to marshal the evidence that Adam Skelos, as to Glenwood and College about this alleged legislative commitment that we, again, dispute actually happened. But taking it arguendo, that Adam Skelos had any knowledge. And so, what they're saying here is, well, what they say in their brief is, that's a detail. Adam Skelos didn't need to know the detail. He didn't need to know the details of the quo of the quid pro quo. I don't know how that is consistent with conspiracy or aiding and abetting law. He had to know that his father was going to take legislative action. I mean, that was the government's theory. He didn't have to know which bills, which pieces of legislation. Why is that not enough? I don't see where that was even made to the jury. They didn't even make the case to the jury that it was legislation in a generic sense or in a vague sense. They ignored this issue, and I'm calling them on it, and I think you should too, like the court did in Biagi. In Biagi, the government, they blew it in Biagi, they blew it here. And in Biagi, they made the same kind of arguments that you're entertaining. He didn't say a word that you're entertaining about, well, he didn't show up at work, or he was surly at work, or he was overpaid, and so forth. The same things were said in Biagi, and frankly, they were also said in the McDonald case. And the Supreme Court said, depending on which is your favorite metaphor, we prefer the scalpel over the meat cleaver, or the net is too big. The net is too big, Your Honor, as to these people in Adam Scalise's situation. Thank you very much. All right, thank you to all sides. We're going to take the case under advisement.